Filed 8/21/24  In re A.R. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G063607 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 21DP1317, 21DP1318) |
| v. | |
| J.M. et al, | O P I N I O N |
| Defendants and Appellants. | |

Appeal from orders of the Superior Court of Orange County, Julie Anne Swain, Judge. Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant P.R.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*          \*          \*

J.M. (Mother) and P.R. (Father), the parents of dependent children A.R. and C.R., now ages 14 and 13 respectively (the children), appeal from the orders terminating their parental rights and freeing the children for adoption, pursuant to Welfare and Institutions Code section 366.26.[1]

Mother and Father argue the juvenile court erred by terminating reunification services at the disposition hearing. Neither challenged that order by a writ petition, and the issue therefore has been forfeited. Even if we were to consider the issue now, we would conclude the Orange County Social Services Agency (the Agency) offered or provided reasonable services to Father.

Mother and Father also challenge the termination of parental rights on the grounds the juvenile court failed to make a finding of detriment to the children and because there was no evidence the children were adoptable. We conclude the court's findings of detriment at the disposition hearing, which were not challenged, were sufficient for purposes of the section 366.26 hearing, and there was substantial evidence the children were adoptable.

We therefore affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

2

FACTUAL AND PROCEDURAL BACKGROUND[2]

I.

DETENTION THROUGH DISPOSITION

A petition was filed in November 2021 alleging A.R. and C.R., then ages 12 and 10 respectively, came within section 300, subdivision (b)(1). At the time, they were living with Mother. Father resided in Mexico, having been deported around 2014 due to drug-related criminal offenses. Mother was alleged to have failed to provide for the children's medical, educational, and basic hygiene needs. She also was alleged to have an unresolved history of mental health, anger management, and substance abuse problems. The children were ordered detained and removed from Mother's custody.

In December 2021, Father contacted the Agency to express his interest in being involved in the child welfare proceedings and his availability to participate in the jurisdiction/disposition hearing scheduled in January 2022.[3] Father indicated he was willing to participate in reunification services, and the social worker informed Father she had left a message with the Mexican Consulate regarding services available in Tijuana. Regarding visitation, the jurisdiction report noted: "Since he lives in Tijuana, face to face visits will be difficult to complete. Contact between the father and the children [has] consisted of one phone call since they came to the attention of Social Services. The father reported that he will continue to call them. In the future, communication via video chats may be explored." Father was given

_____

[2] Although Mother joined in Father's appeal, she does not raise any separate arguments. We therefore limit our summary of the relevant facts to those necessary to understand and analyze the issues before us.

[3] Father's contention that the social worker did not attempt to contact him in Mexico until June 7, 2022, is incorrect.

contact information for the children, but he lost the information. Father initially maintained consistent contact with the Agency, participated in the development of a case plan, and participated in a child and family team meeting. However, he later stopped contacting the children or the social worker, and his phone number was changed or disconnected.

At the jurisdiction hearing, the juvenile court found the allegations of the petition, as amended, true by a preponderance of the evidence and found the children came within the court's jurisdiction. At the disposition hearing, Father's counsel submitted. The court found by clear and convincing evidence it would be detrimental to the children to vest custody with *either Mother or Father* and declared the children to be dependents of the court.

Father's case plan responsibilities consisted of general counseling, parenting education, a 12-Step program, an outpatient substance abuse program, and substance abuse testing. Father was approved to have unsupervised phone calls with the children.

II.

THE AGENCY'S ATTEMPTS TO CONTACT FATHER

Because of a series of continuances (the reasons for which are irrelevant to the issues on appeal), separate six-month, twelve-month, and eighteen-month hearings were not held in this case. The status review reports, interim reports, and addendum reports filed by the Agency between September 2022 and May 2023 revealed the following regarding attempts to communicate with or about Father, his case plan services, and his visitation with the children.

4

Between May and July 2022,[4] the Agency made repeated attempts to communicate with the Mexican Consulate in Santa Ana to discuss Father's case plan services. In August, the assigned social worker met with a consulate employee and was advised the consulate had thus far been unable to locate Father in Mexico. The social worker provided the consulate employee with the address the Agency currently had for Father.

In June and July 2022, the social worker made several attempts to contact Father by phone, but was never able to leave a voicemail message.[5] On July 27, the social worker mailed a contact letter to Father at the address on file.

On August 18, 2022, the social worker contacted the paternal grandmother, who provided a new cell phone number for Father. The next day, the social worker was able to communicate directly with Father. Father confirmed he had not participated in any case plan services, and the social worker told him to contact Desarrollo Integral de la Familia, a Mexican child welfare agency in Tijuana, Mexico (DIF). (See *In re N.O.* (2019) 31 Cal.App.5th 899, 903.) The social worker also provided Father's new cell phone number and address to the Mexican Consulate.

On August 24, 2022, the social worker spoke with Father via cell phone. Father advised he had the next day off work and would be going to DIF to get help with his case plan services. On September 8 and 27, 2022, the social worker called Father's cell phone and left a voicemail and/or text message requesting a follow up call regarding his case plan services. The children's caregiver reported Father had an unsupervised phone call with

[4] May 4, May 17, June 6, June 16, June 29, and July 20, 2022.

[5] June 7, June 29, and July 20, 2022.

5

A.R. for one hour on August 28, 2022. The social worker advised the caregiver physical visits were currently suspended, but the children could use WhatsApp to have videoconference visits with Father.

As of September 2022, the Agency believed additional time was necessary to assess Father's ability to address the issues that brought him before the juvenile court, and it recommended the court continue reunification services for Father.

On October 14, 2022, a consulate employee sent an email advising the Agency that cross-border visits would be suspended until further notice. On the same day, the social worker spoke with Father via cell phone. Father told the social worker he had not gone to DIF because there were three locations in Tijuana and he was unsure which one to go to. Father could not explain why he had not requested further information from the social worker. Father promised to text his current mailing address to the social worker and to contact the social worker on another day to schedule a telephonic meeting in November. Father failed to provide his mailing address despite multiple text messages from the social worker over the next seven months requesting the address.[6]

In response to a request from the social worker, an employee of the Mexican Consulate sent an email to the Agency on November 9, 2022, reiterating that cross-border visits were suspended until further notice.

---

[6] October 19, October 20, October 26, November 21, and December 15, 2022; January 19, January 20, February 9, February 15, February 21, March 2, March 3, March 13, March 20, April 4, April 10, April 17, May 8, May 15, May 17, and May 24, 2023. The social worker noted he was using the WhatsApp application, so he could confirm Father had read his text messages.

Despite multiple communications between the Agency and the consulate,[7] in-person visitation between Father and the children was never an option during the relevant period.

The addendum reports for January through May 2023 noted Father had made no progress on his case plan.

In March 2023, A.R. reported he had not talked to Father, but would like to do so. The social worker advised A.R. in-person visits were not possible at that time. In April, A.R. told the social worker he had been text messaging Father via Facebook Messenger. The children's maternal grandmother had helped A.R. find Father on Facebook.

C.R. told the social worker she did not want to talk to Father. The caretaker stated the last phone call between Father and the children occurred in August 2022. She further stated A.R. had not requested any phone calls with Father and C.R. had responded "No" when asked if she would like to talk to Father.

In May 2023, A.R. stated he had not talked to Father "'in a while,'" but he would like to talk to Father on the phone. He was aware the caretaker could contact Father. C.R. again stated she did not want to talk to Father. The caretaker and various relatives confirmed the children had not spoken with Father recently.

In an addendum report dated May 31, 2023, the Agency reported Father had not participated in his case plan and concluded he had "made no progress in mitigating and alleviating the circumstances which have brought him and the children to the attention of the [Agency]." The Agency therefore

---

[7] March 7, March 22, April 7, April 14, May 8, May 15, and May 24, 2023.

recommended reunification services be terminated and the matter be set for a section 366.26 hearing.

Because of a series of continuances involving the unavailability of the court and/or counsel, the six-month, twelve-month, and eighteen-month hearings were consolidated into a single hearing in June 2023. At the conclusion of the contested hearing, the juvenile court found reasonable services had been provided to Mother and Father and returning the children to their parents would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being. The court then terminated reunification services and set the matter for a permanency hearing under section 366.26. Mother filed a notice of intent to file a writ petition to review the order setting a section 366.26 hearing, but never filed a petition.

III.

THE SECTION 366.26 PERMANENCY HEARING

In the section 366.26 report, the Agency noted that because of the children's ages and their status as a sibling set, it could be "challenging" to find them an adoptive home. The children were specifically adoptable, however, as the caregivers with whom they had lived for 18 months wanted to adopt them. The children wanted to be adopted and wanted the permanency of adoption. Their visits with Mother during the child welfare proceedings had caused both of them "anguish." The Agency concluded adoption was the most appropriate permanent plan for the children.

As to the children's relationship with the caregivers/prospective adoptive parents, the Agency noted: "The children have been adjusting well in placement. The caregivers are meeting the children's medical, developmental, emotional, and educational needs. The caregivers have consistently followed up with the undersigned regarding the children's

8

medical appointments, as well as newly achieved developmental milestones. The children appeared to be doing well in their current placement home as evidenced by their warm, loving and affectionate relationship towards the caregiver. The children . . . have a CASA worker, and they enjoy their outings, and have a strong support system through maternal family members. Furthermore, the caregivers are willing and capable of providing permanency for the children through adoption. The undersigned has observed positive interactions between the caregivers, the caregiver's child during the children's monthly visits. The children have shown attachment to the caregivers and have been responsive to simple directions from them."

The Agency noted nothing had happened since reunification services were terminated that would enable the children to be safely returned to either Mother or Father. The maternal relatives, who had visited the children regularly during the child welfare proceedings, expressed their desire that the children be adopted by the caregivers/prospective adoptive parents.

Based on all the foregoing, the Agency recommended the juvenile court terminate parental rights to allow the children to be adopted.

A preliminary adoptive assessment of the caregivers established they understood the rights and responsibilities of adoption, had the ability to meet the children's needs, and were committed to providing permanency for the children. When the children were asked to identify someone by whom they would like to be adopted, A.R. identified the caregivers "'because I feel safe.'" C.R. said adoption means to "'live with the person forever and they are your parents. I want that to happen with [the caregivers], to live with them.'" C.R. also said the caregivers "'feed us and care for us'" and take them on trips.

C.R. testified at the section 366.26 hearing she wanted to be adopted by the caregivers/prospective adoptive parents. She said her desire to be adopted would not change even if adoption, rather than legal guardianship, meant she could not visit with Mother or her maternal relatives again.

A.R. also testified at the section 366.26 hearing he would like to be adopted by the caregivers/prospective adoptive parents. But A.R. testified he wanted a permanency plan that would allow him to continue to have visits with Mother and his maternal relatives, and he "would say no" to being adopted if it meant having no contact with them. He wanted Father to continue being his father.

No other witnesses were called to testify at the hearing. The juvenile court found the children were likely to be adopted, and neither Mother nor Father had met their burden of proving an exception to adoption. Therefore, the court ordered that Mother and Father's parental rights over the children be terminated and the children be placed for adoption. Mother and Father separately filed timely notices of appeal.

DISCUSSION

I.

TERMINATION OF REUNIFICATION SERVICES

A. *Failure to File a Writ Petition*

On appeal, Father challenges the reasonableness of the reunification services provided to him by the Agency. An order terminating reunification services and setting a section 366.26 hearing must be challenged by a writ petition. (§ 366.26, subd. (*l*)(1), (2).) Mother timely filed a notice of intent to file a writ petition after the hearing setting the section 366.26 hearing, but later submitted a letter to the Court of Appeal indicating

10

her intent not to file a petition because of a lack of arguable merit, pursuant to *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 583–584. No party ever filed a writ petition. Father therefore waived his right to challenge the termination of reunification services.

Father argues good cause exists to excuse his failure to comply with the writ petition requirement because the juvenile court's record lacks evidence the court clerk served him with a written advisement of the right to seek writ review of the order terminating reunification services and setting the section 366.26 hearing. "[J]udicial error in failing to advise a party in a dependency proceeding of the writ requirement for challenging an order setting a section 366.26 hearing that results in a failure to file a writ petition may excuse a party's failure to comply with that requirement and allow a reviewing court to reach the issues on appeal from the orders following the section 366.26 hearing." (*In re A.H.* (2013) 218 Cal.App.4th 337, 347.)

California Rules of Court, rule 5.590(b) provides, in relevant part: "When the court orders a hearing under section 366.26, the court must advise all parties and, if present, the child's parent, guardian, or adult relative, that if the party wishes to preserve any right to review on appeal of the order setting the hearing under section 366.26, the party is required to seek an extraordinary writ by filing a *Notice of Intent to File Writ Petition and Request for Record (California Rules of Court, Rule 8.450)* (form JV-820) or other notice of intent to file a writ petition and request for record and a *Petition for Extraordinary Writ (California Rules of Court, Rules 8.452, 8.456)* (form JV-825) or other petition for extraordinary writ. [¶] . . . [¶] If a party is not present when the court orders a hearing under section 366.26, within 24 hours of the hearing, the advisement must be made by the clerk of the court by first-class mail to the last known address of the party or by electronic

11

service in accordance with section 212.5. If the notice is for a hearing at which the social worker will recommend the termination of parental rights, the notice may be electronically served in accordance with section 212.5, but only in addition to service of the notice by first-class mail." (Cal. Rules of Court, rule 5.590(b)(2).)

Father was not present at the hearing at which reunification services were terminated and the matter was set for a section 366.26 hearing. Pursuant to California Rules of Court, rule 5.590(b), the court clerk provided the writ advisement to him by first-class mail. The court's minute order from the hearing reads, in relevant part: "Parents noticed by first class mail that if the party wishes to preserve any right to review on appeal of the order setting the hearing under Welfare and Institutions Code Section 366.26, the party is required to seek an extraordinary writ by filing a Notice of Intent to File Writ Petition and Request for Record (JV-820) and Petition for Extraordinary Writ (JV-825). [¶] Clerk to send writ advisement to [Mother and Father] to their address on file. [¶] Forms JV-820 and JV-825 and copy of minute order dated June 27, 2023 mailed on June 28, 2023 to: [Mother and Father]."

Father argues, however, that the writ advisement did not comply with the Rules of Court because it was not sent with a proof of service. He contends the advisement is a "notice," which is defined in California Rules of Court, rule 5.502(27) as "a paper to be filed with the court accompanied by proof of service on each party required to be served in the manner prescribed by these rules. If a notice or other paper is required to be given to or served on a party, the notice or service must be given to or made on the party's attorney of record, if any." Therefore, he argues, the clerk was required to

12

attach a proof of service to the writ advisement. This argument fails for three related reasons.

First, the writ advisement required by California Rules of Court, rule 5.590(b) is not a paper to be filed with the court, but rather is an advisement "made by the clerk," for which a formal proof of service is not required. (Cal. Rules of Court, rule 5.590(b)(2).) Notably, that rule refers to the clerk *making* a writ advisement, not *serving* a notice on an absent party. Second, rule 5.502(27) references notice to or service on an attorney of record; rule 5.590(b), however, requires that the writ advisement be sent to a party, further indicating rule 5.502(27) does not apply to writ advisements. Third, rule 5.502(27) specifically notes that its definitions do not apply if "the context or subject matter otherwise requires." To make sense together, rules 5.502(27) and 5.590(b) cannot be read as Father suggests.

The notation in the minute order that the writ advisement had been mailed to Father was sufficient to show the court advised Father of the right to seek writ review of the order terminating reunification services and setting the section 366.26 hearing because "[i]t is presumed that official duty has been regularly performed." (Evid. Code, § 664; see *In re Mary C.* (2020) 48 Cal.App.5th 793, 806.) Father has offered nothing to rebut this presumption that the writ advisement was mailed as indicated. The issue has been waived for purposes of this appeal.

*B. Reasonable Services Were Offered or Provided*

If we were to address the issue despite its waiver, we would review the juvenile court's finding that reasonable services had been provided or offered under the substantial evidence standard. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.) "[I]n reviewing the reasonableness of the reunification services provided by the [Agency], we must . . . recognize

13

that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) In reviewing the reasonableness of services offered, we view the evidence in a light most favorable to the respondent and draw all reasonable inferences to uphold the juvenile court's order. (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70.) The Agency bears the burden of proving by clear and convincing evidence that reasonable services were provided. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 674.) We must bear this heightened standard of review in mind when applying the substantial evidence test. (*Ibid.*)

Where the issue of reasonable services is considered for the first time at a combined six-, twelve-, and eighteen-month hearing, we must consider whether reasonable services were provided throughout the entire dependency period. (*Serena M. v. Superior Court, supra*, 52 Cal.App.5th at p. 675.)

Services for parents, such as Father, who have been deported may include: "Reasonable efforts to assist parents who have been deported to contact child welfare authorities in their country of origin, to identify any available services that would substantially comply with case plan requirements, to document the parents' participation in those services, and to accept reports from local child welfare authorities as to the parents' living situation, progress, and participation in services." (§ 361.5, subd. (e)(1)(E).) Father contends the services provided were not reasonable because the social worker failed to arrange services with DIF and failed to attempt to communicate with Father through Facebook.

14

The evidence is undisputed that on August 24, 2022, the social worker spoke with Father, at which time Father stated he would go to DIF the next day to get help with his case plan services. The social worker was unable to contact Father in September despite leaving multiple voicemail and text messages. On October 14, 2022, the social worker again was able to contact Father, who stated he had not gone to DIF because he was confused about which location he should go to. Father promised to text his current mailing address to the social worker and to schedule another telephone call. But Father failed to communicate with the Agency for seven months, despite numerous messages from the social worker. Although the Agency's written reports show the social worker used different phone numbers to contact Father, we see this as an attempt to go beyond the information provided by Father and make additional efforts.

In *In re D.R.* (2019) 39 Cal.App.5th 583, the appellate court concluded the child welfare agency had failed to give the father adequate notice of the proceedings and granted his section 388 motion to void the jurisdiction and disposition orders as to the father. After the children were detained, the mother told the child welfare agency the father had been deported to Mexico. (*Id.* at p. 587.) An older half-sibling advised the child welfare agency investigator he had contact with the father through Facebook, and someone had provided the agency a phone number in Mexico. (*Ibid.*) One of the dependent children spoke with the father via cellphone during an unmonitored visit with another half-sibling, who also had contact with the father via Facebook. (*Id.* at p. 588.) The agency never asked the half-siblings about the father's Facebook profile, conducted searches only within the United States, and did not research the father's whereabouts after being provided with a Mexican telephone number for him. (*Id.* at pp. 588–589.) The

15

agency did not follow up with the mother although she told the juvenile court she had taken the children to visit the father in Tijuana. (*Id.* at p. 592, fn. 2.)

The appellate court reversed the jurisdiction and disposition orders because the agency had failed to exercise reasonable diligence in locating the father. The agency could have asked the half-siblings to help locate the father via social media and could have used search methods more likely to produce useable results. "Not once did DCFS follow the most likely means of being able to actually identify Father and gain his contact information to notify him." (*In re D.R., supra*, 39 Cal.App.5th at pp. 591–592.)

Similarly, in *In re A.G.* (2017) 12 Cal.App.5th 994, the appellate court held the juvenile court failed to provide reasonable services to the parent living in Mexico. "The record does not contain any evidence to show that during the review period, the Agency assisted A.J. in contacting DIF for service referrals or identified any available services that would substantially comply with case plan requirements. The record shows that A.J. was not offered, or provided with, the court-ordered services in his case plan during the review period. Accordingly, we conclude there is not substantial evidence to support the reasonable services finding." (*Id.* at p. 1003.)

The facts at hand are very different from those in *In re D.R.* and *In re A.G.* Contrary to the implication in Father's opening brief, neither the statute nor the relevant cases impose on the Agency a duty to contact foreign child welfare authorities on behalf of the deported parent, rather than to assist the parent in contacting those authorities. Substantial evidence in this case supports the juvenile court's finding the Agency took all reasonable steps to provide reasonable services to Father in Mexico. This is not a case where the Agency was looking for a needle in a foreign haystack without the use of social media or other contacts provided by the deported parent's family. To

16

the contrary, the Agency had actual contact with Father; Father participated in creating his case plan; and the Agency communicated to him the steps he needed to take to obtain those services and identified for him the organization in Mexico at which he could do so. Father then ceased all contact with the Agency without providing updated contact information.

Where—as here—the Agency has contact information for an out-of-country parent and uses that contact information to communicate with that parent, develop a case plan, and provide information on where and how to obtain services in the foreign country, but the parent ceases communication with the Agency and fails to even attempt to participate in services or to contact the children, there is sufficient evidence that reasonable services have been provided. A.R.'s communication with Father through Facebook messenger does not change our analysis. The appellate record reflects this communication did not begin until April 2023 and had ended by May 2023. This method of communication was clearly no more likely to elicit a response from Father than the ones being used by the Agency.

The Agency's failure to arrange visits between Father and the children did not deny reasonable services to Father because visitation was not permitted during the relevant time period. Moreover, from the beginning of Father's participation in the child welfare case, the Agency made clear video visits would be necessary, but Father failed to communicate with the children in this fashion.

The Agency did not fail to provide or offer reasonable services to Father.[8]

## II.

### TERMINATION OF PARENTAL RIGHTS

"'The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. [Citations.] In making this determination, the juvenile court must focus on the child, and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family. [Citations.] In reviewing the juvenile court's order, we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]' [Citations.] We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming." (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561–1562.)

Adoption is the preferred option after parental rights have been terminated. (§ 366.26, subd. (b)(1).) One of the exceptions to the preference for adoption is that a child who is 12 years of age or older objects to the termination of parental rights by the juvenile court. (§ 366.26, subd. (c)(1)(B)(ii).)[9] We review the juvenile court's decision not to apply that

---

[8] In reaching this conclusion, we need not rely on the Agency's references to its internal policies and memorandum of understanding with the Mexican government. We do not accept Father's argument these are irrelevant, however.

[9] A.R. and C.R. were 14 and 12, respectively, at the time of the section 366.26 hearing.

18

exception for substantial evidence. (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333.) Father bears the burden of showing the court's order is not supported by substantial evidence. (*Id.* at pp. 1333–1334.)

A. *Finding of Detriment*

Father argues the juvenile court erred by failing to find by clear and convincing evidence that awarding custody to him would be detrimental to the children. (*In re G.P.* (2014) 227 Cal.App.4th 1180, 1193.) But Father concedes he failed to raise this issue at the section 366.26 hearing. Accordingly, the issue has been forfeited. (See *In re T.G.* (2015) 242 Cal.App.4th 976, 984; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 222.)

Additionally, Father submitted at the disposition hearing without argument. At that hearing, the juvenile court found by clear and convincing evidence pursuant to section 361, subdivision (c)(1) that it would be detrimental to vest custody of the children with *Mother or Father*. Father correctly notes the juvenile court did not make a finding of detriment under section 361.2.[10] There was, however, no error. Previously, section 361, subdivision (c) did not authorize the court to enter an order removing a dependent child from a parent who did not currently reside with that child. (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 629; see *In re V.F.* (2007) 157 Cal.App.4th 962, 969 [§ 361, subd. (c) does not address noncustodial parents].) But at the time of the hearing in this case, section 361, subdivision (d) applied the same standard of detriment whether or not the children

---

[10] Section 361.2 addresses the placement of a child with a noncustodial parent if the juvenile court orders the child's removal from the custodial parent. (§ 361.2, subd. (a).) If the noncustodial parent requests custody, the court must place the child with that parent unless it makes a finding of detriment. (*Ibid.*)

19

resided with the parent at the time the petition was initiated. (Stats. 2017, ch. 665, § 1.) Therefore, the juvenile court's finding of detriment at the disposition hearing was sufficient as to Father as a noncustodial parent, and substantial evidence supports that finding as to both Mother and Father, even in light of the heightened burden of proof.

*B. Substantial Evidence Supports the Finding the Children Were Likely to be Adopted*

Father argues the juvenile court erred by failing to consider legal impediments to adoption under Family Code section 8602, which reads: "The consent of a child, if over the age of 12 years, is necessary to the child's adoption." Father contends the evidence did not support a finding the children would consent to adoption by the caregivers. Family Code section 8602 does not apply in this child welfare proceeding. "Dependency proceedings are special proceedings governed by their own rules and statutes. [Citations.] Statutes applicable to civil cases are not applicable to dependency actions unless expressly made so. [Citations.] Further, although section 366.26 explicitly adopts certain provisions of the Family Code, there is no provision under section 366.26 adopting Family Code section 8602 for juvenile dependency court proceedings." (*In re Christopher L., supra*, 143 Cal.App.4th at p. 1333, fn. 3.)

More important, contrary to Father's argument, the children did express their desire to be adopted by the caregivers. C.R. testified at the section 366.26 hearing she wanted to be adopted by the caregivers, even if that meant she would not thereafter see her parents and extended family. A.R. also testified he wanted to be adopted by the caregivers. Both children expressed an understanding of the difference between adoption and legal guardianship, and both testified they would prefer not to lose contact with

20

Mother and their extended family. But both ultimately expressed their desire to be adopted by the caregivers. The caregivers indicated they would allow visits between the children and their relatives.

*C.  There Was No Error in Failing to Allow A.R. to Testify Regarding Whether He Would Consent to Adoption*

Father argues the juvenile court erred by prohibiting Father from asking A.R. if he would consent to adoption. The following colloquy occurred at the hearing:

"Q [To A.R. from Father's counsel]: Do you know, as you sit here today, that you would have to consent and sign off on your own adoption?

"The Court: Ms. Nerney, I am going to object. I am not going to allow that question. It's not the state of the law as the Court understands it.

"Ms. Nerney: I believe it is, Your Honor, for children over 12.

"The Court: They can object, but their consent is not required.

"Ms. Nerney: I believe at the adoption hearing they have to sign the form.

"The Court: My understanding is that whatever the forms are—

"Ms. Nerney: I can—

"The Court: —they can object to the termination of parental rights. The Court still would have to find a compelling reason for determining that termination would be detrimental to the child due to that circumstance."

Because consent to adoption is not an issue for the juvenile court's consideration at a section 366.26 hearing, the court did not err in prohibiting the inquiry.

## DISPOSITION

The orders terminating parental rights are affirmed.


GOODING, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.